UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARY PHILLIPS,<br><br>                Plaintiff,<br><br>        v.<br><br>VICTOR COMMUNITY SUPPORT<br>SERVICES, INC.,<br><br>                Defendant. | No.  11-cv-3182-TLN-CMK<br><br><br><br>**FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW** |

A bench trial was conducted in this matter on May 12, 2014, through May 14, 2014. Plaintiff Mary Phillips ("Plaintiff") alleged under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12100 *et seq.*, that Defendant Victor Community Support Services, Inc. ("Defendant"): 1) discriminated against her because of a disability; 2) failed to make reasonable accommodations to enable her to perform the essential functions of her job; and 3) retaliated against her for engaging in protected activity.  For each of the three claims, the Court finds Plaintiff has not shown by a preponderance of the evidence that the requisite elements are met. Therefore judgment is ordered in favor of Defendant.  The Court submits the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).

1

# FINDINGS OF FACT

## Trial testimony

1. The following witnesses testified at trial:

   - Deborah Engs, "Ms Engs", Plaintiff's supervisor from late 2008 through Plaintiff's termination.  (Reporter's Transcript, "TR", 5–160.)

   - Jubin Meriti, Plaintiff's expert on damages. (TR 165–184.)

   - Dawn Haskins, Plaintiff's former supervisee and coworker.  (TR 186–190.)

   - Denise Craig, Plaintiff's former supervisee and coworker.  (TR 199–227.)

   - Katherine Rayden, the Human Resources Director during the period from late 2008 through Plaintiff's termination.  (TR 199–227.)

   - Toni Heideman, Plaintiff's former roommate and coworker.  (TR 229–234.)

   - Mary Phillips, Plaintiff.  (TR 242–335.)

## Background and material events

2. Defendant provides behavior and mental health services to children and families.  (TR 131:23-132:1.)  Defendant employs over 900 employees. (TR 209:14-21.)

3. Plaintiff began her employment with Defendant beginning in November, 2001, when she served as a clinician.[1]  (TR 242:10-12.)

4. Plaintiff was promoted to clinical supervisor in January, 2006. (Plaintiff's Exhibit, "Pl. Ex.", 77.)

5. Michael Elterman ("Dr. Elterman") was Plaintiff's executive director and supervisor from the start of her employment until sometime in 2004.  (TR 242:13-16.)

6. Following Dr. Elterman's departure, Paul Werner ("Dr. Werner") became Plaintiff's executive director and supervisor, until his departure in August or September, 2008.  (TR 243:14-20.)

---

[1] The Court infers that Plaintiff, during her tenure with Defendant, was based at one or more offices in Shasta County.

7.  Following Dr. Werner's departure, Ms. Engs became Plaintiff's executive director and supervisor at the Shasta County office.  (TR 6:25-7:1.)

8.  At some point in 2007, Plaintiff had surgery due to complications from a prior case of shingles.  The surgery involved tying down her diaphragm.  Plaintiff had the same type of surgery in 2008.  For each of the aforementioned surgeries, Plaintiff took approximately six weeks off from work.  (TR 252:16-253:24.)  Following her second surgery in 2008, Plaintiff returned to work in October, 2008.  Her supervisor when she returned was Ms. Engs.  This was the first time Plaintiff had worked for Ms. Engs.  (TR 253:24-254:4.)

9.  Plaintiff's health issues resulted in chronic lung issues which were a disability within the meaning of the ADA. (ECF No. 22 at 2; Pl. Ex. 61; TR 254:7-18.)

10.  On January 7, 2009, Ms. Engs met with Plaintiff to discuss deficiencies in her work performance.  (TR 260:1-17)  Subsequently, Ms. Engs received a letter from an attorney representing Plaintiff.  (TR 40:20-42:3.)

11.  Plaintiff met with Ms. Engs and Trinda Dailey, the human resources manager at the time, on January 12, 2009.  (TR 261:19-24.)  At that meeting, Plaintiff was given a severance and release agreement, which had an effective date of January 14, 2009.  (TR 262:1-3.)  Plaintiff did not sign the agreement.  (TR 56:19-20.)

12.  Plaintiff's attorney subsequently sent Defendant another letter, dated January 12, 2009, stating in relevant part: "Unfortunately my client informs me that instead of responding directly to me, Victor TC has further harassed Ms. Phillips with a termination/waiver of rights ultimatum with a short unlawful two day response decision time.  Needless to say such conduct subjects the employer to litigation risks ….  It is clear your attorney should review this matter and contact [me] regarding this situation forthwith."  (Pl. Ex. 100-7.)

13.  On January 26, 2009, Plaintiff met with Ms. Engs and Trinda Dailey, at which point she was demoted from clinical supervisor to clinician.  (Pl. Ex. 79.)  The demotion letter stated in relevant part: "I have serious concerns regarding your performance, especially in the areas of developing and maintaining trust with your supervisees, professional

3

communications with other staff and peers, working as a positive member of your team and other leadership skills." (Pl. Ex. 37.)

14. On August 19, 2009, Ms. Engs issued Plaintiff a written warning indicating that Plaintiff left her scheduled clients to be seen by someone else without making arrangements for coverage, and that Plaintiff did not contact her supervisor regarding the absence, in violation of protocol. (Defendant's Exhibit, "Def. Ex.", L.)

15. On September 3, 2009, Plaintiff made a formal written request for accommodation to work four days per week instead of five and modifications to her case load. That request was granted in writing, and signed by Ms. Engs, Trinda Dailey, and Plaintiff.[2] (Pl. Ex. 36.)

16. On September 15, 2009, Ms. Engs issued Plaintiff a second written warning, stating Plaintiff had failed to notify a client of the need to cancel an appointment and had failed to notify her supervisor or office staff. (Def. Ex. M.)

17. On September 15, 2009, Ms. Engs also issued Plaintiff's annual performance review, with ten areas checked to indicate "unacceptable or needs improvement." (Pl. Ex. 35.)

18. On November 3, 2009, Plaintiff was terminated. The reasons cited in the termination letter were: a continued pattern of poor judgment, poor customer service, and a lack of professional communication; the incidents giving rise to the two written warnings on August 19, 2009, and September 15, 2009; an incident discussed at an October 30, 2009, meeting with Ms. Engs, involving whether Plaintiff documented attempts to contact a client's guardian on a client database; and Plaintiff's informing Ms. Engs her license had expired just prior to her termination. (Pl. Ex. 34.) Ms. Engs also testified that the "full scope" of Plaintiff's employment was factored into the decision to terminate. (TR 106:7-9.)

19. Ms. Engs testified that at no point did Plaintiff's health issues factor into her analysis of Plaintiff's performance. (TR 9:25-10:3.) She testified that Plaintiff's volume of leave,

---

[2] The request was initially dated September 1, 2009, but the request was granted and signed by Plaintiff, Ms. Engs, and Trinda Dailey on September 3, 2009.

4

and the reasons for her leave, were not considered in the decision to terminate.  (TR 127:9-17.)

**Plaintiff's disability**

20. The Court does not locate within the trial testimony or the submitted briefing wherein Plaintiff states a specific time period when her chronic lung issues became a disability, or whether related health issues – for example the surgeries involving Plaintiff's diaphragm in 2007 and 2008 –  were or were not part of Plaintiff's disability.  The main health issue testified to at trial was Plaintiff's recurring bouts of pneumonia, which the parties agree constitutes a disability.[3]

21. Plaintiff's Proposed Findings of Fact and Conclusions of Law (ECF No. 45 ¶ 34) asserts that Plaintiff took leaves of absence ("LOAs") from work in April, May, July, August, and September 2009, due to recurring bouts of pneumonia.  Plaintiff directs the Court to exhibits 30, 38, 60, 61, 62, and 63, which appear to show that LOAs were taken during these months.  (ECF No. 45 ¶34.)  Defendant does not dispute the facts contained in the aforementioned exhibits.

22. Plaintiff also testified – apparently consistently with her proposed FF&CL – that she experienced recurring bouts of pneumonia a minimum of ten times in 2009, and that she "might have missed a period of two weeks at a time and a week at another time." (TR 254:7-18.)

23. Plaintiff does not claim that she was discriminated against due to her chronic lung issues (nor that she suffered any adverse employment actions) prior to her returning to work in October, 2008.

---

[3] A "disability" under the ADA refers to "(A) physical or mental impairment that substantially limits one or more major life activities []; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))."  A "major life activity" includes, but is not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  A major life activity "also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. 12102(1) and (2).

5

24. In light of the foregoing, the Court finds Plaintiff was disabled due to her chronic lung issues, starting at least in October, 2008, when she returned to work following her diaphragm surgery.[4]

**Annual Performance Reviews: 2004 - 2009**

25. Plaintiff's annual performance reviews from 2004 through 2009 contained shaded areas that indicated "unsatisfactory or needs improvement" and lighter areas that indicated satisfactory or praiseworthy performance.  They were signed by Plaintiff and her supervisors at the time, either Dr. Elterman, Dr. Werner, or Ms. Engs.  (Pl. Ex.'s 3, 4, 7, 8, 9, 35.)

26. Plaintiff's annual performance review dated January 12, 2004 (Pl. Ex. 4) was signed by Dr. Elterman and did not contain any check-marked areas indicating Plaintiff's performance was unacceptable or needed improvement.  The concluding comment stated:

> You have missed considerable amount of time from work which has, I am sure, inconvenienced you a great deal. It has also impacted the time you have been able to spend with your clients.  It is my hope that this year will be a healthier year for you.  You have missed 10 days due to ill health in this current fiscal year alone.  On one occasion, you could have added good information to the teams [sic] knowledge base but felt that on one occasion you had information you only wanted to share if you could get paid for it above and beyond your salary.  I believe as clinicians it is our responsibility to pass along information to team members however we receive it, to better the team. In many other instances you have shared openly and willingly and in such a manner that indicates to me that this instance was "out of character." In general, you have been generous with your time and equipment, beyond expectations.  Overall, you are an asset to the team and your attitudes about treatment and families are professional respectful, and has at least as much impact on the successes that you have had with clients as your clinical knowledge base.  You have worked hard to gain the knowledge you need for the new client base you are working with.  You have also provided an invaluable service to this agency by being what I call a "utility infielder."  Where ever we have needed you, you were willing to perform and learn.  This is an example of

---

[4] *See* Plaintiff's complaint, ECF No. 1 ¶ 9 (Plaintiff "suffers from chronic lung issues, and upon returning to work from a lung-related surgery [] in October 2008 …"); ECF No. 1 ¶ 11 (After being demoted in January, 2009, Plaintiff "was required to miss significant additional amounts of work due to her disability including a hospitalization for a week in April 2009 due to contracting pneumonia.  After her discharge, she was required to miss at least ten additional days of work due to recurring bouts of pneumonia over the next six months.").  *See* Plaintiff's trial brief, ECF No. 26 at 1 (Plaintiff's disability was "caused by chronic lung issues"); ECF No. 26 at 2 (Plaintiff returned to work in October, 2008 "following a diaphragm surgery which was related to plaintiff's … chronic lung issues.")

> your unique contribution to this agency.  You also have a fun
> loving attitude and generally spread that around.  While this is 'just'
> who you are, it does not take away the positive influence it has on
> the program.  Thank you.

27. Plaintiff's annual performance review dated March 22, 2005 (Pl. Ex. 3) was signed by Dr. Werner and contained one check-marked area which indicated Plaintiff's performance was unacceptable or needed improvement.  That area involved attendance and noted that Plaintiff "[h]ad been absent, late, or left early a few times in the past year (due to illness)." The concluding comment stated:

> Ms. Phillips has demonstrated a great deal of flexibility in
> providing clinical coverage in multiple programs ... She has
> exhibited a positive attitude when asked to give an extra hand.  Has
> been supportive of peers and has shared her clinical knowledge and
> skills.  Ms. Phillips recognizes and is taking pro-active steps in
> dealing w/ her health issues, which have affected her attendance
> during evaluation period.  It has been a pleasure working w/ Ms.
> Phillips during this time.

28. Plaintiff's annual performance review (subsequent to her being promoted from clinician to clinical supervisor) dated July 19, 2006 (Pl. Ex. 7) contained no check-marked areas in which the Plaintiff's performance was unacceptable or needed improvement.  The concluding comment stated:

> Mary has transitioned to being a clinical supervisor in a very
> satisfactory manner.  She has achieved a high level of trust with the
> clinicians she supervises over a short period of time.  Her desire to
> learn + grow in the new role is complemented by her active role on
> the VCSS Training Committee.

29. Plaintiff's annual performance review dated October 16, 2007 (Pl. Ex. 8) contained no check-marked areas in which the Plaintiff's performance was unacceptable or needed improvement.  The concluding comment stated:

> Mary is a valuable member of the leadership team who brings
> intelligence, good perception, knowledge and skill to her role.  She
> is a diligent worker who makes every effort to be aware of
> community partner needs, supervisee needs + program needs.  She
> will work on goal one especially this year.[5]

30. Plaintiff's annual performance review dated August 1, 2008 (Pl. Ex. 9) was signed by Dr. Werner and contained check marks in the following areas indicating performance was

---

[5] Goal one appears to state: "Develop more supervisional [sic] presentation."

unacceptable or needed improvement: "Frequently requires assistance or direct supervision with coordinating the provision of Medi-Cal client documentation to ensure appropriate levels of billable service and compliance with state and federal requirements for patient records," and "Supervisor is inconsistent in providing live supervision."

Accompanying comments written by Dr. Werner included:

> Mary trains/supports staff to achieve their potential and provide services according to professional standards.  She encourages their development clinically and as a united VCSS site.

> Mary contributes ideas to the development of all VCSS programs and encourages others to do the same.  She has been an active participant in the Strategic Priorities Program.

> Mary has struggled to process accurately the Medical documentation of her supervisees.  Errors have gone undetected and have been picked up by others.  This area is one of needed growth.

> Mary works well with a variety of community partners … and in the schools served by her supervisees.

> Mary provides supervision to staff and documents this appropriately.  She is conscientious about completing evaluations.

> Mary strives to work well with others, and to facilitate communication and good relations among all staff at this site.

> Mary is respectful of her supervisor, her peers, and those she supervises.  She is open to feedback, and does not hesitate to suggest ways to improve our programs and solve problems.

> Mary has good judgment about both clinical matters and program issues.

> Mary is creative, and suggests systems that will enable us to be more effective in both pragmatic + clinical ways.  At times she is behind in reviewing closures and following up with documentation that needs correct [sic].

> Mary has done field supervision with all but one very experienced clinician.  She has stated she wishes to increase frequency to agency minimum standard of quarterly.

> Mary is sensitive to differences among people and is personally accepting of others without judgment.  She encourages her supervisees to become increasingly culturally sensitive.

> Mary works very well as a team member with the leadership team and her school-based clinical team.  She has a very strong work ethic and has much to contribute to the agency based on her knowledge + clinical experience.  Her timely and accurate

8

1    processing of her supervisees medical documentation needs
     improvement and must be an ongoing issue in her supervision."

2    31. Plaintiff's annual performance review dated September 15, 2009 (Pl. Ex. 35) which was

3    completed by Ms. Engs, contained check marks in the following areas indicating

4    Plaintiff's performance was unacceptable or needed improvement, with accompanying

5    typed comments by Ms. Engs (italicized):

6    Assessments and/or plan development completed but turned in late.
     *See peer chart audit corrections lists between Feb and Sept '09.*

7    *Multiple entries indicate Mary's failure to submit important*
     *paperwork in a timely fashion.*

8    

9    Quality or timeliness of documentation is unacceptable. *Reference*
     *audit corrections from peer audits.   Mary has also had a*
     *consent/registration incomplete from May '09 and continued to*

10   *treat the client.  Mary has also had difficulty closing charts in a*
     *timely fashion and has allowed TAR to expire.*[6]

11   

12   Difficulty articulating mission, values, strategic priorities, and
     inconsistent alignment.  *Mary is clear on the mission, values and*
     *strategic priorities of our agency.  She struggles, however, in*

13   *applying these to her every day work as exemplified by numerous*
     *communication and teamwork errors.*

14   

15   Difficulty completing administrative duties as assigned with
     inconsistency in meeting standards.  *Mary sometimes responds to*
     *administrative requests in a timely manner but other time does not.*

16   *Recent examples of this include completing her e-learning late and*
     *turning in her team evaluation late and has not attended the Safety*

17   *and Wellness Committee meeting in the last 5 months.*[7]

18   Has on occasion failed to meet Agency standards regarding
     attendance within the past year.  *Mary has received two written*

19   *warnings due primarily to her failure to call off appropriately and*
     *notify her clients of appointment cancellation.*

20   

21   Has on occasion failed to meet Agency standards regarding
     working harmoniously with others.   *Written warnings have*
     *highlighted times Mary has struggled to communicate with others*

22   *and this has negatively impacted working with others.  Mary has*
     *attempted to repair these relationships.*

23   

24   Has on occasion failed to meet Agency standards regarding team
     collaboration.  *Mary has received a demotion and two written*

25   *warnings pertaining to her lack of team collaboration and*

26   [6] "TAR" refers to Treatment Authorization Request.  The typed in portion by Ms. Engs originally stated "TARs"
     (plural), which was crossed out and replaced with the handwritten "TAR" to indicate just one instance of allowing a

27   TAR to expire.  (TR 320:3-18.)

28   [7] Plaintiff testified that she was not on the Safety and Wellness Committee in the five months preceding this review.
     (TR 330:1-5.)

9

*communication.*

Has on occasion failed to meet Agency standards regarding respecting supervisor authority. *While Mary outwardly respects the authority of her supervisor, she sometimes commits to actions and fails to follow through.*

Sometimes makes decisions that violate established policies. Makes decisions based on emotion. *Mary's failure to follow procedures demonstrates a lack of sound decision making skills.*

On several occasions has not completed assigned tasks in a timely manner. *See reference to assessments / documentation / administrative duties as above.*

In the "Comments" section following these checked areas, Ms. Engs wrote:

During this evaluation period, Mary was demoted from Clinical Supervisor to Clinician due to her insufficient professional communication, lack of team work and below standard quality of work. Mary has also received 2 additional written warnings after the demotion for her failure to follow these same expectations. Mary frequently exhibits an energy and interest in improving the work she does, but often fails to put this into action. While Mary has some quality clinical skills, she struggles to bring the other necessary skills to her role with consistency; her intention is good but her follow through is often lacking. Where Mary excels is in her passion for mental health services and her ability to meet and exceed the Service Percentage expectation consistently.

In the "Individual Goals" section following the "Comments" section, Ms. Engs wrote:

- "Increase appropriate communication with all professional contacts."

- "Solve health problems."

- "Learn more / improve skills re: Trauma-focused CBT and Motivation Interviewing."

In the "Measurable Objectives" that correlated, respectively, to each "Individual Goal" enumerated above, Ms. Engs wrote:

- "Zero incidents representing a lack of communication in Mary's work."

- "Be released by doctor to return to full time regular schedule."

- "Attend trainings and bring info back to team and use for improved effectiveness."

32. The 2009 annual performance review also contained checked areas indicating positive performance, including the area of "Completes paperwork and turns it in on time." That area contained Ms. Engs' handwritten comment: "Mary completes her progress notes on time." (Pl. Ex. 35 at 2.)

33. Plaintiff met with Ms. Engs to discuss the 2009 annual performance review. (TR 317:17-19.)

34. Regarding the "Individual Goals" and "Measurable Objectives" sections, Ms. Engs testified that it was her practice to ask employees, during the meeting, what goals they would like to include; Ms. Engs would write them on the review; and the employee would review the document and sign it. (TR 79:5-12.)

35. Ms. Engs testified that it was Plaintiff's idea to put "Solve health problems", and "Be released by doctor to return to fulltime regular schedule" on the 2015 annual performance review. (TR 77:25-79:4.) Plaintiff testified that these items were already written on the review when she went into the meeting on September 15, 2009, and that Plaintiff had not told Ms. Engs that those were in fact her (Plaintiff's) goals. (TR 271:19-272:9.)

36. To the extent Plaintiff and Ms. Engs offered conflicting testimony regarding whether Ms. Engs had already filled in the "Individual Goals" and "Measurable Objectives" sections on the September 15, 2009, annual review, prior to the meeting at which they discussed the review, and whether Ms. Engs had consulted with Plaintiff prior to writing these goals, the Court credits Ms. Engs' testimony.[8]

37. Ultimately, Plaintiff's five annual performance reviews, from 2004 through 2008, described consistently good performance by Plaintiff. Three areas were checked, during those five years, indicating unsatisfactory performance. The reviews mention errors in completing paperwork accurately and in a timely manner. The reviews also mention Plaintiff's health problems.[9]

---

[8] The Court finds Ms. Engs credible on this point based on the fact that Plaintiff signed the September 15, 2009, review without noting any objection to the "Individual Goals" and "Measurable Objectives". Further, Plaintiff submitted into evidence a "response" to the September 15, 2009, annual review. (Pl. Ex. 23.) The response is a three-page document, typed, signed, and dated on September 15, 2009, and states "This response is not currently being shared with my supervisor/Executive Director ...." (Pl. Ex. 23 at 6.) Plaintiff's response addresses and disputes the accuracy of many items contained in the annual review, while asserting Plaintiff's belief she was being retaliated against due to her prior attempts to fight her termination. As it relates to the Court's credibility determination on this point, Plaintiff's response does not contain any mention of or objection to the handwritten "Individual Goals" and Measurable Objectives" contained in the annual review. Essentially, Plaintiff had at least two opportunities to object to the offending language contained in the "Individual Goals" and "Measurable Objectives" at or near the time they were created but failed to do so.

[9] The notes about Plaintiff's health, in the 2004 through 2008 annual reviews, concerned Plaintiff's absences due to

11

**Weekly/90 Day/Six Month Evaluations**

38. Plaintiff's "Weekly/90 Day/Six Month" evaluations, dated April 25, 2006 and July 19, 2006, had all boxes checked showing that Plaintiff met applicable performance and conduct standards.[10]  (Pl. Ex.'s 5, 6.)

**The 2008 Personnel Review**

39. Ms. Engs prepared a "Review of Plaintiff's Personnel and Supervisory Record" (the "2008 Personnel Review") in November, 2008, with the intent of making a summary document of Plaintiff's employment with Defendant.  (TR 20:8-9; Pl. Ex. 78.)  That review contained notes on Plaintiff's employment, beginning with her hire in November, 2001 and concluding with a November 26, 2008, Supervision Note by Ms. Engs.  The review also documented Plaintiff's health issues, as follows (Pl. Ex. 78 at 4-5):

> Mary has had significant health issues during her employment as indicated by previous notation and the following:
>
> 1/17/03 Documentation of an accommodation for "a disability that affects her right hand" Mary was provided with a signature stamp. It was also indicated that VCSS offered voice-activated software as an additional accommodation but that Mary refused, choosing to use a software she had paid for.
>
> 4/3/03 Mary filed for State Disability with return to work date 4/14/03
>
> 10/7/05 Claim Effective date for State Disability (Medical LOA for Off-the Job Injuries, Illnesses and Disability: 9/26/05 – 10/31/05 for surgery)
>
> 6/21/07 Claim Effective date for Mary filed for State Disability
>
> 5/7/08 Dr. note indicating Mary is to be off work due to medical condition
>
> 5/12/08 Dr. note indicating Mary may return to work
>
> 5/23/08 Fit for Work exam requested of Hilltop Medical clinic due to concerns of "…observations of uncontrolled coughing and concerns about the clarity of her thinking".  The exam signed by Mark Pierce, M.D. indicated she was "Fit for Work with no

---

her health issues.

[10] The latter (Pl. Ex. 6) lists a date of July 19, 2007 at the top, but Dr. Werner and Plaintiff, next to their signatures, both dated the review as July 19, 2006.

limitations".

8/1/08 Mary's last day of work; Earned wages through PTO from 8/4/08-8/15/08 per her disability application.

8/18/08 Mary began a Leave of Absence and applied for State Disability

10/8/08 Mary returned to work with Hilltop Medical Clinic "Fit for Work with no limitations" exam on 10/7/08

40. Ultimately, the Court views the 2008 Personnel Review to have emphasized negative information and omitted some available positive information in Plaintiff's record. That review was not a comprehensive view of Plaintiff's employment, given the record submitted by the parties to the Court, but it does not indicate a pre-textual intent to terminate Plaintiff.

**Written Warnings: September 15, 2009 & August 19, 2009**

41. Ms. Engs issued written warnings to Plaintiff on August 19, 2009 and September 15, 2009. (Def. Ex.'s L, M.)

42. The written warning dated August 19, 2009 (Def. Ex. L) stated:

On 8/14/2009 you left your scheduled clients to be seen by someone else without making arrangement for coverage. In addition you did not contact your supervisor regarding your leaving work early. This demonstrates poor judgment, poor customer service, and a lack of teamwork and professional communication.

Regarding the failure to notify your supervisor when you were leaving work, the applicable portion of the Attendance standard states: []

*'All VCSS Shasta employees are expected to report to work as assigned and/or requested, and to make every effort to avoid a pattern of excessive absenteeism. Excessive absenteeism places unfair burdens on co-workers and decreases the quality of service delivery to children and families by disrupting work schedules, creating inefficiencies and waste, delays, costly overtime and undue job pressures.*

*[ ] Staff unable to report to work as scheduled must contact their supervisor at least 1 hour prior to the start of the workday.*

*Staff calling in will call their direct supervisor explaining the need for absence and what arrangements have been made for coverage*

*or changing appointments.*

*If the supervisor is unavailable to answer the phone, staff will leave a voice mail message with the information as outlined above.*

*In addition to contacting the direct supervisor, staff will also notify the office personnel and request that their absence be entered in the Sign-Out log. This contact must be a person-to-person conversation, not just a voice mail message.*

*Staff are responsible for arranging coverage for all scheduled responsibilities for the missed time and must work with the supervisor and/or team to ensure consistent and quality service to children and families affected by unplanned time off.* [11]

You have been warned about this behavior previously. In a corrective action dated 1/26/09, it was explained that "You will follow procedure when you must call in sick by contacting your supervisor, the Executive Director, via cell phone as early as possible, explaining your change in schedule to include whether others dependent on your schedule have been contacted to cancel." Teamwork and communication were also referenced in the previous corrective action: "You will participate in effective communication with all members of the VCSS team as well as clients, families and community partners."

Plaintiff wrote in the "Employee Comments" section, below the warning:

"I accept that I did not follow proper procedure and will do so at all times

in the future.

43. With respect to the August 19, 2009, warning, Plaintiff testified: "I became very ill at

work. I was coughing a great deal, almost to the point of not being able to breathe very

well, and I realized I had to leave. I couldn't see my clients. Ms. Engs was not in the

building. I went to the front desk and I told the office staff that I had to leave – this was

between coughs – and office staff indicated they would notify people or tell people or I

don't remember the exact language, but my understanding from it was that they would

take care of anyone who had to be notified." (TR 267:1-10.)

44. At the time the August 19, 2009, warning was issued, Plaintiff explained to Ms. Engs the

action Plaintiff had taken with respect to the cancellation of the appointment. (TR 266:6-

269-11.)

45. The written warning dated September 15, 2009 (Def. Ex. M) stated:

---

[11] Italics not in original.

On the afternoon of 9/4/09, the office received a phone call from the guardian of a new client with whom [Ms. Philips] had scheduled an intake.  The guardian was concerned because you had not shown for the appointment that day as scheduled and the child was in need of services.  Your Outlook calendar indicated the appointment was still scheduled and there was no notation in the referral database explaining an attempted contact to cancel, even though you took the day off after the appointment was scheduled. You report that you attempted to contact the client to reschedule but there was no way to leave a message.  You failed, however, to notify your supervisor as well as office staff who would be receiving the client's call.  This demonstrates poor judgment, poor customer service, and a lack of teamwork and professional communication.

You have been warned about this behavior previously.   In a corrective action dated 1/26/09, teamwork and communication were referenced: 'You will participate in effective communication with all members of the VCSS team as well as clients, families and community partners.'  In a corrective action dated 8/19/09, you were reminded of the importance of arranging for coverage or appropriately canceling and rescheduling appointments with your clients.

Any further instance of this poor judgment, poor customer service, lack of teamwork or professional communication, or failure to follow any other protocol, will result in termination.

Plaintiff wrote in the "Employee Comments" section, below the warning:  "Not as an excuse, but an explanation I was extremely ill that day and was as stated unable to reach client's mother either then or earlier [and] failed to put earlier attempts on referral database[.]"

46. With respect to the September 15, 2009, warning, Plaintiff testified:  "I was off sick one day.  I called Ms. Engs in the morning before work and told her I was not going to be in that day because I was ill.  I had an intake client.  I attempted – whenever I felt well enough during the day to try a phone call, I attempted to call that client.  There was no answer.  Eventually, I stopped trying."  (TR 269:21-270:1.)

47. Ms. Engs testified, regarding Plaintiff's attempt to document her attempts to contact the client's guardian: "Mary told me verbally that she had attempted contact with that guardian and that [s]he had documented that in the client database.  When I reviewed the client database to find that documentation, it was nonexistent." (TR 75:5-8.)  During her

15

testimony, Plaintiff did not appear to dispute this statement by Ms. Engs, but did state she could not put attempts to reach the client's mother on the "referral database," and that would have to be done at Defendant's offices.  (TR 270:19-23.)

48. Regarding protocol when an employee had to miss appointments with clients, Ms. Engs testified: "Staff decides what needs to happen with their case loads.  If they're out ill or for whatever reason, they can certainly go to an office staff person and request assistance, but they have to let their supervisor know what is happening and they have done that." (TR 73:9-13.)

49. Ms. Engs testified Plaintiff did not communicate to her, on the days giving rise to the written warnings, that Plaintiff was having recurring bouts of pneumonia.  (TR 85:3-12.)

50. Dawn Haskins, Plaintiff's supervisee during Plaintiff's tenure as a clinical supervisor, testified that, when she had to miss appointments with clients: "First thing that I would do is to call my supervisor or text her or whatever her preference was and let the office staff know I would not be in, and I would say 99 percent of the time I would call my clients and let them know.  There were a couple of occasions like a family emergency that I would call and ask somebody to make that call for me."  (TR 188:3-10.)

51.  Denise Craig, Plaintiff's coworker and supervisee, testified that her practice, generally, was to call clients herself when she had to miss an appointment, but she would not consider herself subject to discipline if someone else did.  (TR 196:4-25.)

52. Toni Heideman, Plaintiff's coworker and friend, testified that staff would notify clients when a clinician had to miss an appointment.  (TR 231:14-18.)

53. Plaintiff testified regarding the practice of staff – as opposed to the clinician – arranging coverage: "Some of the clinicians did that if they were very sick and couldn't notify their clients or if they were very sick at home or didn't have their client's phone numbers at home."  (TR 267:11-12.)

54. Ultimately, the Court finds that the protocol for missing work due to an illness is described in the August 19, 2009 warning.  That protocol required Plaintiff to call her supervisor, leave a voicemail if the supervisor did not answer, and personally arrange

16

coverage for her missed appointments.  Plaintiff did not follow protocol on each of the days giving rise to either the August 19 or September 15, 2009, written warnings. Relative to the August 19, 2009 matter, Plaintiff testified she did not contact the client to cancel the appointment, she did not notify her supervisor, she told staff that she was leaving, and based upon the staff's response she understood they would notify Plaintiff's scheduled clients.  (TR 267:1-10.).  As to the September 15, 2009, matter, Plaintiff testified she notified her supervisor Ms. Engs[12], she did not cancel her intake appointment with a client, she did not notify staff, she tried to call the client but stopped after several unsuccessful attempts, and she either did not or was unable to put her attempts to contact the client in the database.  (TR 269:21-270:1, 19-23.).  In each instance, the Court finds that Plaintiff either failed to contact clients and/or properly arrange for staff to notify clients of her unavailability or failed to properly notify her supervisor of her unavailability.

**MFT License**

55. Plaintiff's Marriage and Family Therapy ("MFT") license was not expired on the date she was terminated, although in the days leading up to her termination, Plaintiff had explicitly told Ms. Engs that she "couldn't go to the school to see kids because her license hadn't been renewed."  (Pl. Ex. 100-29; TR 113:14-17; 108:12-14.)

56. Defendant did not have a written policy with respect to what a clinician is supposed to do to renew his or her license.  (TR 126:22-127:8.)

57. A printout out from the Board of Behavioral Sciences, dated November 3, 2009, 8:23 AM showed that Plaintiff's MFT license was set to expire on October 31, 2011.  (Pl. Ex. 100-

---

[12] Plaintiff's counsel argues (ECF No. 45 at 13-14) there was conflicting testimony between Plaintiff and Ms. Engs regarding: 1) whether Plaintiff communicated to Ms. Engs that Plaintiff was having recurring bouts of pneumonia on the dates giving rise to the written warnings of August 19, 2009 and September 15, 2009; and 2) whether Plaintiff had told Ms. Engs she had been sick and tried to make arrangements for coverage on the dates giving rise to the two written warnings.  However, in reviewing the trial transcript, there did not appear to be material conflicts in the testimony, rather the Court did find differences in Plaintiff's and Ms. Engs' interpretation of whether the protocol and/or practice of missing appointments was followed.  One area of conflict is noted in ¶ 47, wherein Plaintiff failed to refute during her trial testimony Ms. Engs testimony that Plaintiff expressly told her that she had inputted certain information into the client database; when Ms. Engs checked the database she found that Plaintiff had not, in fact, inputted the information.  The Court credits Ms. Engs' testimony on this issue.

29.) Ms. Engs testified with reference to this printout: "I had checked the [BBS] database prior to this printout, Exhibit 29, and it hadn't posted yet. When I reviewed the printout that day, it indicated it had been renewed." (TR 111:18-19.)

58. Plaintiff testified she told Ms. Engs, at the meeting regarding her termination on November 3, 2009, that her license had not expired. (TR 279:13-17.)

59. Plaintiff's termination letter, dated November 3, 2009, stated as one of the reasons for termination that: "On 11/2/09 you informed your Director that you would not be able to provide treatment at your assigned schools because you believed your MFT license to be expired. You submitted your license renewal form to your OSM/HRM on 10/19/09 with a license expiration of 10/31/09. The renewal form states that it takes 4-6 weeks for the renewal to be processed but you chose to delay your request to the office until there were just 2 weeks left to renew. This represents poor judgment on your part and interferes with your ability to provide service to your clients." (Pl. Ex. 34.)

60. In a response to Plaintiff's interrogatories, Defendant stated: "Additionally, Plaintiff was no longer qualified for the position of clinician because she no longer held a valid MFT license." (Pl. Ex. 94 at 6.)

61. In Plaintiff's February 26, 2010, position statement submitted to the EEOC, Defendant stated: "Respondent agrees that Complainant was discharged on November 3, 2009, because she failed to renew her Marriage and Family Therapist license. An essential requirement of the Clinician position is to hold a clinical license … Because Complainant was no longer registered with the State to provide services, her work could no longer be billed the State for Medi-Cal. Allowing an unlicensed clinician to work at schools could have subjected VCSS to criminal liability for Medi-Cal fraud." (Pl. Ex. 24 at 29.)

62. At her deposition, Ms. Engs stated that one of the reasons she terminated Plaintiff was that Plaintiff had allowed her license to expire, and that she had checked the BBS database on November 3 and it listed the license as expired. (Pl. Ex. 100 at 209:15-20.)

63. Ultimately, Plaintiff did not dispute that she stated to Ms. Engs, in the days leading up to her termination, that her MFT license was going to expire. Plaintiff's doing so was a valid

reason for termination.  During her trial testimony on this issue, Ms. Engs stated that when she checked the database prior to November 3, 2009, Plaintiff's license had not been renewed, but when she checked the database on November 3, it showed Plaintiff's license had been renewed to October 31, 2011.  (TR 109:10-111:20.)  During her deposition testimony Defendant Engs contradicted her subsequent trial testimony when she stated that when she checked the database on November 3, 2009, it said Plaintiff's license had expired.  (Pl. Ex. 100 at 209:15-20; TR 108:23-109:9.) At trial, Engs explained she "clearly misspoke" during her deposition and never had a chance to review her deposition transcript.  (TR 110:4-25.)  Plaintiff's counsel attacked Defendant Eng's credibility based on what she testified to at the deposition on this issue versus her trial testimony.  The Court credits Defendant Eng's explanation that she simply misspoke during her deposition.  In any event, Plaintiff's termination letter indicates that she was not terminated because her license had expired; rather one of the reasons as stated in the letter was Plaintiff's poor judgment in delaying her license renewal.

**Request for accommodation**

64. Plaintiff made a written request for accommodation based on her disability which included:

- A proposal to work 4 days per week rather than 5.
- A reduction in caseload, including that Plaintiff not receive any home-based referrals.
- A statement that Plaintiff's current caseload was 29 clients, 5 of which were home-based and 8 which were opened in the last week; Plaintiff wrote in the request that the 29 clients "does not take into account the clients who [were] open to [her], but whom [she] plan[ned] to close as soon as [she could] do the paperwork."

The request was granted and signed by Plaintiff, Ms. Engs, and Trinda Dailey on September 3, 2009.  (Pl. Ex. 36.)

65. Plaintiff's counsel sought to impeach Ms. Engs on when she became aware of Plaintiff's disability.  Plaintiff's counsel directed Ms. Engs to:

19

- The 2008 Personnel Review (Pl. Ex. 78), which documents that Plaintiff had health problems prior to September 3, 2009.

- Internal human resources documents showing Ms. Engs signed off on Plaintiff's return from leaves of absence to full-time status, including documents dated April 27, 2009, May 4, 2009, and August 1, 2009.  (Pl. Ex. 30.)

- A formal notice of leave granted to Plaintiff, signed by Trinda Dailey, and stating that on April 27, 2009, Plaintiff "requested a leave of absence due to an off-the-job injury, illness or disability, and you have provided us with a medical certificate of need."  (Pl. Ex. 38.)

- A form provided by Victor to Plaintiff to take to her private doctor regarding an interactive process involving an ADA issue.  The form stated Plaintiff had recurrent bouts of pneumonia.  The form was dated by Plaintiff's physician on August 28, 2009. (Pl. Ex. 61.)

- An FMLA/CFRA[13] Medical Certification, signed on June 9, 2009 by Plaintiff, stating "Patient needs to be able to work intermittently until July 31, 2009.  Patient may need to leave early from work."[14]  (Pl. Ex. 63 at 1.)

66. Ultimately, the Court finds Ms. Engs was aware Plaintiff was experiencing health problems at least starting in November, 2008, when she compiled the 2008 Personnel Review that documented some of these problems.[15]  Ms. Engs was aware, starting at least in April, 2009, when Plaintiff took a leave of absence for a recurring bout of pneumonia, that Plaintiff was experiencing chronic lung issues.  Ms. Engs was formally put on notice that Plaintiff had a disability that required accommodation, on or about September 3, 2009, when Plaintiff made the written request.  The Court does not view Ms. Engs'

---

[13] The federal Family and Medical Leave Act and the California Family Rights Act.

[14] A different FMLA/CFRA medical certification form, signed and dated by Plaintiff on April 29, 2009, was also included in Plaintiff's Exhibit 63.

[15] Ms. Engs also testified that Dr. Werner had mentioned, during the time she and Dr. Werner were both working at Victor in August or September 2008 that Plaintiff was not currently at work because she was on medical leave.  (TR 91:14-22.)

testimony on when she became aware of Plaintiff's disability or other health problems damaging as to Ms. Engs' overall credibility.

**Requests for extensions and reductions in caseload**

67. Plaintiff's Exhibit 100-28, entitled "Victor Community Support Services Clinician Case Load", lists the caseload number for eight clinicians, including Plaintiff, as of October 5, 2009 and November 2, 2009.  On October 5, 2009, Plaintiff had 29 cases, second most among the listed clinicians.  On November 2, 2009, Plaintiff had 28 cases, most among the listed clinicians.[16]  (Pl. Ex. 100-28.)

68. Plaintiff testified, with respect to the period following the September 3, 2009, request for accommodation, that neither her caseload nor her actual workload was reduced.  (TR 276:15-17.)

69. Plaintiff testified, with respect to the period following the September 3, 2009, request that she told Ms. Engs she had too much work to do given her health problems and, as a result, that she could not complete all the tasks assigned to her.  (TR 276:18-21.)  Plaintiff testified she "asked for an extension for my recerts on things like blood-borne pathogens … and [she] asked for an extension on closing cases," and that it was possible for Ms. Engs to grant extensions for these tasks. Ms. Engs did not grant them.  (TR 275:24-276:25; 308:25-309:9.)

70. Plaintiff testified, generally, that between February and September 2009, she had requested extensions from Ms. Engs to complete tasks because of her medical issues.  Those requests were denied.  (TR 329:6-17.)

71. Plaintiff testified that the time constraints due to her medical issues made it difficult to both provide good service to her clients and "close charts", and that she had explained this to Ms. Engs.  (TR 275:24-276:21.)

---

[16] The Court lacks context for what group of clinicians this was, but infers this was the group of clinicians working on or around Plaintiff's site in Shasta County.  Ms. Engs testified: "First of all, this document wasn't produced by my office, so I have no way to know whether these are accurate numbers or inaccurate.  I believe this was produced by Mary herself."  (TR 152:6-9.)  Otherwise, Ms. Engs did not appear to dispute that, at the time of Plaintiff's termination, she had among the highest caseloads of the clinicians working at or around Plaintiff's site.

72. Plaintiff did not put in writing her requests for extensions or her explanations that she needed more time to complete tasks due to her medical issues.  (TR 331:20-23.)

73. Ms. Engs testified, with respect to the period following the September 3, 2009, request, that Plaintiff never told her that Plaintiff was unable to close cases due to her medical condition.  Ms. Engs also testified: "In order for a clinician to have a lower caseload, they have to transfer or close cases off of their own caseload, and that's their responsibility.  I documented numerous times in supervision notes that Plaintiff failed to do her closings on time and we talked several times about reducing her caseload, and that was up to her.  (TR 91:6-92:10.)

74. Ms. Engs completed supervision notes based on weekly meetings with Plaintiff.  During these sessions, Ms. Engs would present questions, concerns, kudos or anything that she believed Plaintiff's job required her to have knowledge of, and Plaintiff could raise concerns she had.  Ms. Engs would take handwritten notes each session on what was said, and she allowed the supervisee to review the notes and sign them.[17]  (TR 138:9-140:1.)

75. Ms. Engs' supervision note, dated September 3, 2009, states: "Mary is transferring 2 of her schools to another clinician.  Mary will dedicate time next week for closings …" (Def. Ex. P at 43.)

76. Ms. Engs' supervision note, dated September 15, 2009, states: "[Plaintiff] [r]ecently completed 2 closings; has 9+ closings pending.]"  (Def. Ex. P at 44.)

77. Ms. Engs' supervision note, dated September 29, 2009, states: "[Plaintiff] [d]id 2 new openings but one may be transferred to another clinician because of school changes.  Working on closing cases." (Def. Ex. P at 45.)

78. Ms. Engs' supervision note, dated October 6, 2009, states: "[Plaintiff] [w]ill have 28 clients after completing 6 pending closings.  2 referrals pending.  Mary wants to continue to expand groups.  This may lead to an increase in Rehab referrals."  (Def. Ex. P at 46.)

---

[17] Some of Ms. Engs' supervision notes documented interactions she had had with other employees regarding Plaintiff's performance; so these were not a documentation of her meetings with Plaintiff and they were not signed by Plaintiff.  (*See* Def. Ex. P at 7-8.)

79. Ms. Engs' supervision note, dated October 29, 2009, states: "She has reduced her caseload to 28 but is pending 5 openings," and includes further discussion regarding Plaintiff's attempts to close cases.  (Def. Ex. P at 47.)

80. In sum, Plaintiff testified that between February and her termination, she verbally requested extensions to complete work, including requests for extensions to close cases, but did not do so in writing.  Ms. Engs testified that after the September, 2009 accommodation request, Plaintiff never told her that Plaintiff was unable to close cases due to her medical condition.  It seems wholly inconsistent that Plaintiff would submit a written request for accommodation due to disability on September 3, 2009, yet fail to also request in that very same document extensions to both complete work and close cases due to medical reasons.  It's also worth noting that Plaintiff signed the request for accommodation which was approved by Ms. Engs.  Simply put, this Court did not find Plaintiff's testimony regarding her verbal requests for extensions to complete work and close cases for medical reasons to be credible.  Further, Ms. Engs' supervision notes, which were signed by Plaintiff, show that Ms. Engs and Plaintiff addressed the reduction of Plaintiff's caseload multiple times after September 3, 2009, including the opening and closing of specific cases.  The supervision notes provide a somewhat detailed picture of Plaintiff either working on or attempting to close cases.  The supervision notes also indicate that Plaintiff wanted to continue to expand groups which would lead to an increase in referrals to Plaintiff.  Further, Defendant Engs documented Plaintiff's attempts to close cases.  Overall, the supervision notes show that Plaintiff did not make an adequate effort to reduce her caseload on her own.  The Court notes that Plaintiff's annual performance review dated August 1, 2008, signed by Dr. Werner, also references an issue Plaintiff had with closing casings: "At times she is behind in reviewing closures and following up with documentation that needs correct [sic]."  (Pl. Ex. 9)

///

///

23

**Service percentage**

81. Plaintiff's "percentage billed to Medi-Cal" or to other agencies, for the pay periods of September 13, 2009 to September 26, 2009; September 27, 2009 to October 10, 2009; and the first quarter of 2009-2010 was the "highest among her peers."[18]  (Pl. Ex. 100-20; TR 98:1-24.)  That Plaintiff consistently met or exceeded her service percentage expectations was included on the September 15, 2009 annual review.  (Pl. Ex. 35 at 6.)

**Problems with paperwork**

82. Paperwork and accurate recordkeeping were important for meeting Defendant's mission as well as funding source expectations regarding payment.  (TR 134:20-135:4.)

83. During Plaintiff's employment under Ms. Engs' supervision, Defendant was required to make a request to Shasta County every six months to reauthorize the services Defendant delivered to a child.  Doing so required the timely completion of a treatment plan for the child by the clinician.  Plaintiff had problems completing her treatment plans.  (TR 135:8-136:4.)

84. While Plaintiff's supervisor, Dr. Werner completed supervision notes that documented Plaintiff's performance and his and Plaintiff's meetings regarding Plaintiff's performance.  (Def. Ex. P at 1-6; Pl. Ex. 83.)

85. Dr. Werner's supervision note, dated January 4, 2008, stated: "Additional errors encoding / billing called to Mary's attention that were given to her at leadership meeting on 1-3."  (Pl. Ex. 83 at 17.)

86. Dr. Werner's supervision note, dated January 8, 2008, stated in part: "Errors in TBS cases reviewed with Mary and Suzanne [;] Notes not sent to Co. [;] Duplicate notes, missing notes [;] Time same on summary (weekly) [;] Error in time on multiple documents, e.g. daily or weekly [;] Notes not signed [;] Diff. between summary and notes [;] Variability in quality of notes [;] Missing weekly [;] Lack of [unreadable] on cases [;] Mary told things

---

[18] The Court infers this was the group of clinicians working generally within Plaintiff's supervision group, or at Plaintiff's site, in Shasta County.

need to change.  Errors need to be caught, fixed if she is to continue in job." (Pl. Ex. 83 at 17.)

87. Dr. Werner's supervision note, dated April 8, 2008, stated in part: "Improvement in areas discussed before about paperwork." (Pl. Ex. 83 at 8.)

88. Dr. Werner's supervision note, dated June 17, 2008, stated in part: "Talked about improvements in paperwork." (Pl. Ex. 84 at 4.)

89. Dr. Werner's supervision note, dated July 15, 2008, stated in part: "Discussed means of avoiding clerical errors in documentation + picking them up in reviewing documentation." (Pl. Ex. 83 at 3.)

**Relationships with coworkers and supervisees**[19]

90. Dr. Werner's supervision notes on Plaintiff, dating from at least May 2, 2006 through July 29, 2008, during the time Plaintiff was a clinical supervisor, contained no indication Plaintiff had a poor relationship with her supervisees.  (Pl. Ex. 83; TR 52:20-53:6.)

91. The annual performance review dated August 1, 2008, completed by Dr. Werner, contained mostly positive comments of Plaintiff's relationship with her co-workers and supervisees, with the exception of her processing the medical documentation of her supervisees. (Pl. Ex. 9.)

92. Ms. Engs' supervision note, dated October 14, 2008, describes that a staff member had approached Ms. Engs with concerns regarding Plaintiff's role as a supervisor, including that (as written by Ms. Engs), Plaintiff had "publically and inappropriately made comments during staff meeting yesterday.  [The staff member] reported that this has happened previously and she is concerned about impact of supervisor's contention on direct staff."  (Def. Ex. P at 7.)

93. Ms. Engs' supervision note, dated October 17, 2008, describes one of Plaintiff's supervisees, Rachel Freeman, reporting to Ms. Engs that she felt "belittled, unheard, and

---

[19] At trial, the parties did not object on hearsay grounds to any of the evidence included in this section.  The parties stipulated to the admission of the applicable portions of Ms. Engs' supervision notes.  (Def. Ex. P1-P47.)

dismissed" by Plaintiff.  The note was not signed by Plaintiff.  (Def. Ex. P at 8; TR 38:17-22.)

94. Ms. Engs' supervision note, dated November 5, 2008, described a discussion Ms. Engs and Plaintiff had regarding steps Plaintiff intended to take to improve relations with co-workers and be a more effective supervisor.  The note was signed by Plaintiff.  (Def. Ex. P. at 11.)

95. Ms. Engs' supervision note, dated November 6, 2008, describes a staff member's concern regarding "long-standing difficulties" working with Plaintiff.  The note was not signed by Plaintiff.  (Def. Ex. P at 12.)

96. Ms. Engs testified Plaintiff's supervisee, Maria Rodriguez-Roa, had informed Ms. Engs she did not trust Plaintiff in their supervisor-supervisee relationship.  (TR 39:21-24.)

97. A supervisor evaluation form regarding Plaintiff, completed by a clinician who resigned in December, 2008, contained mostly negative ratings.  The employee exit survey completed by the same clinician cited "did not get along with my supervisor" as the primary reason for leaving.  In accompanying comment to the exit survey, the employee wrote: "Terminate or demote Mary Phillips + hire a clinical supervisor that can represent themselves professionally and has adequate experience in clinical work + supervision." (Pl. Ex. 88.)

98. Dawn Haskins testified she had no problems with Plaintiff serving as her supervisor.  (TR 187:3-5.)  She believed some of her co-workers were frustrated with Plaintiff having to miss time from work due to medical issues.  (TR 188:24-190:11.)

99. Denise Craig testified she had no problems with Plaintiff serving as her supervisor and thought Plaintiff was a good supervisor.  (TR 194:9-13.)

100. Ultimately, the Court views the facts to be that some staff members did not have any issue with Plaintiff as a supervisor.  However, other employees did have concerns with Plaintiff serving as their supervisor in the period following Plaintiff's return to work in October, 2008 until termination was raised by Ms. Engs at the January 7, 2009 meeting. The

disgruntled employees presented a legitimate reason to raise the issue of termination at the January 7, 2009, meeting.

**January, 2009 Meetings**

101. Plaintiff testified, regarding the January 7, 2009, meeting with Ms. Engs, that Ms. Engs: "told me that there were issues with my performance, and when I requested to know what the issues were, she said she didn't feel that I could correct the issues, so she thought I would be better off not working for Victor." (TR 260:13-17.) Ms. Engs testified she did not recall discussing termination with Plaintiff on January 7th. (TR 41:20-22.) To the extent Defendant Engs' lack of recall creates a conflict, the Court credits Plaintiff's uncontradicted testimony and finds there is a possibility termination was raised at the January 7, 2009, meeting based on what transpired during the meeting on January 12, 2009.

102. Regarding the meeting with Ms. Engs on January 12, 2009, at which Plaintiff was presented with the severance and release, Plaintiff testified she understood the January 14, 2009, date on the release to be her last day to "make a decision." (TR 262:1-8.)

103. Regarding the meeting on January 26, 2009, at which Plaintiff was demoted, Plaintiff testified: "I don't remember any discussion. I remember being told I was demoted and being told that there was nothing I could do about it." (TR 264:20-22.) Regarding that same meeting, Ms. Engs testified she had a discussion with Plaintiff regarding maintaining trust with her supervisees and that Plaintiff had expressed concerns to her that the information was inaccurate. (TR 58:10-59:6.) To the extent there is a conflict, the Court credits Ms. Engs' testimony.

**Social Security Disability**

104. Plaintiff applied for Social Security Disability ("SSD") shortly after her termination. She began to receive payment benefits in 2010. She is still receiving SSD benefits. (TR

27

302:1-303:5.)  Plaintiff's two back surgeries were the medical condition permitting her to receive benefits.[20]  (TR 303:23-25.)

105. Plaintiff testified she was capable of working, despite her current receipt of SSD benefits. Plaintiff has applied for other jobs since her termination, including applying for a clinician position in Shasta County, California.  (TR 282:17-284:4, 304:6-12.)

## CONCLUSIONS OF LAW

### At will employment

106. The parties do not appear to dispute that Plaintiff's employment with Defendant was at will.  The Court notes that under California law, an employee's term of employment, when not specified in an employment contract or other document or oral agreement, is considered a term that may be terminated "at will" by either party.  *Pomeroy v. Wal-Mart Stores, Inc.*, 834 F. Supp. 2d 964, 973 (E.D. Cal. 2011).  *See* Cal. Labor Code § 2922. ("An employment, having no specified term, may be terminated at the will of either party on notice to the other.")  "Thus, in the absence of any evidence of the duration or term of employment under a written or oral agreement, there is a statutory presumption that employment is terminable at will, and a contract of employment may be ended at any time at the option of either party." *Eisenberg v. Alameda Newspapers, Inc.,* 74 Cal. App. 4th 1359, 1386 (1999).  The at-will presumption may be rebutted only by evidence of an express or implied agreement that the employment will terminate only "for cause."  *Hoy v. Sears, Roebuck & Company,* 861 F. Supp. 881, 885 (N.D.Cal.1994).

### *McDonnell Douglas* burden-shifting

107. The Court does not formally track the burden-shifting framework of a *McDonnell-Douglas* analysis.  *See Costa v. Desert Palace, Inc.*, 299 F.3d 838, 855-56 (9th Cir. 2002):

> Regardless of the method chosen to arrive at trial, it is not normally appropriate to introduce the *McDonnell Douglas* burden-shifting framework to the jury. At that stage, the framework "unnecessarily evade[s] the ultimate question of discrimination *vel non*." *U.S.*

[20] Plaintiff did not appear to testify further at trial regarding these back surgeries.  (TR 252:16-253:24.)

*Postal Serv. Bd. v. Aikens*, 460 U.S. 711, 714 (1983)].

> Once at the trial stage, the plaintiff is required to put forward evidence of discrimination "because of" a protected characteristic. [f.n.]  After hearing both parties' evidence, the district court must decide what legal conclusions the evidence could reasonably support and instruct the jury accordingly. This determination is distinct from the question of whether to invoke the *McDonnell Douglas* presumption, which occurs at a separate, earlier stage of proceedings, involves summary judgment rather than jury instructions, and is unrelated to the number of possible motives for the challenged action.  *Costa v. Desert Palace, Inc.,* 299 F.3d 838, 855-56 (9th Cir. 2002).[21]

This was not a jury trial, but the Court finds the above-cited reasoning in *Costa* applicable to this case.  The Court does consider, in its analysis, whether Defendant had legitimate, non-discriminatory reasons for taking any adverse employment action, *Texas Dept. of Community Affairs v. Burdine*, 450 U.S., 254-255 (1981), because its findings in that regard are relevant to whether Plaintiff has shown, by a preponderance of the evidence, that her disability was a motivating factor for those actions.

**Discrimination under the ADA: Applicable Law**

108.   To prevail on her disability discrimination claim under the ADA, Plaintiff must establish that she: 1) has a disability; 2) is qualified by demonstrating the ability to perform the essential functions of the job with or without a reasonable accommodation; and 3) that she suffered an adverse employment action because of the disability. *Hutton v. Elf Etochem No. Am., Inc.*, 273 F.3d 884, 891-92 (9th Cir. 2001).

109. To be "qualified", the disabled individual must possess the requisite skill, experience, education, and other qualification standards for the employment position; and must be able to perform the essential functions of the position held or desired with or without reasonable accommodation.  29 C.F.R. § 1630.2(m).

---

[21] The *Costa* court also stated: "In one limited circumstance, the [*McDonnell*-Douglas] presumption retains vitality at trial: where there is no rebuttal by the employer, but the plaintiff's prima facie case is in factual dispute. The jury then determines whether the prima facie case is established. If it is, the jury must find discrimination." *Costa*, 299 F.3d at 851, n. 6 (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509-510).  In the instant suit, Plaintiff has made a prima facie case.

110. Under 42 U.S.C. § 12112(a), "No covered entity shall discriminate … because of the disability of such individual …."). The ADA's "because of" language does not require a showing that a disability or a reasonable request for accommodation be the sole cause for an adverse employment action. *Head v. Glacier Northwest, Inc.*, 413 F.3d 1053, 1063-1066 (9th Cir. 2005). "[T]he ADA outlaws adverse employment decisions motivated, even in part, by animus based on a plaintiff's disability or request for an accommodation – a motivating factor standard." *Id.* at 1065.

**Failure to Accommodate under the ADA: Applicable Law**

111. A "reasonable accommodation" under the ADA means: "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position"; or "[m]odifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities." 29 C.F.R. § 1630.2(o). A reasonable accommodation may include "job restructuring, part-time or modified work schedules … and other similar accommodations for individuals with disabilities." 29 C.F.R. § 1630.2(o).

112. The Court's inquiry looks to whether "the employer took reasonable steps to accommodate [Plaintiff's] limitations in ways that would not impose undue hardship." *McAlindin v. Cnty. of San Diego*, 192 F.3d 1226, 1236 (9th Cir. 1999) (referencing 42 U.S.C. § 12112(b)(5)(A)). "The essence of the concept of reasonable accommodation is that, in certain instances, employers must make special adjustments to their policies for individuals with disabilities … The ADA places a duty to accommodate on employers in order to remove barriers that could impede the ability of qualified individuals with disabilities to perform their jobs. Moreover, this is a continuing duty that is not exhausted by one effort." *Id.* (internal citations and quotation marks omitted).

113. "To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."  29 C.F.R. § 1630.2(o)(3).

**Retaliation under the ADA: Applicable Law**

114. With respect to Plaintiff's retaliation claim under the ADA, Plaintiff must show: 1) she engaged in conduct protected under the ADA; 2) she suffered an adverse employment action; 3) there was a causal link between the protected conduct and the adverse employment action; and 4) the protected activity was a motivating factor in the adverse employment action.  See Ninth Circuit Model Jury Instruction & Comment 12.10 (2007).

**Ultimate Conclusions of Law**

115.  Plaintiff's chronic lung issues were a disability within the meaning of the ADA.

116.  Plaintiff engaged in conduct protected under the ADA: she consulted an attorney regarding her fear of being discriminated against due to her disability in January, 2009; she requested time off multiple times in 2009; and she made a formal request for accommodation, on or about September 3, 2009.[22]

117. Plaintiff experienced adverse employment actions during the time she was disabled: she was demoted and eventually terminated.

118. Plaintiff was qualified for the position of clinician, with a reasonable accommodation given her health issues when terminated, and without a reasonable accommodation if her health issues improved.

119. Defendant had legitimate, non-discriminatory reasons for demoting and terminating Plaintiff.

---

[22] As stated, *supra*, the Court finds there is insufficient evidence to find that Plaintiff requested extensions to complete work due to her medical issues, and thus does not find that Plaintiff engaged in a protected activity by making such requests.

120. Plaintiff has not shown by a preponderance of the evidence that her disability was a motivating factor in her demotion or termination.

121. Plaintiff has not shown by a preponderance of the evidence that Defendant failed to accommodate her disability.

122. Plaintiff has not shown by a preponderance of the evidence that her engaging in a protected activity was a motivating factor in her demotion or termination.

## ORDER

In consideration of the foregoing Findings of Fact and Conclusions of Law, it is ordered that judgment is entered in favor of Defendant.  The Clerk of the Court is directed to close the case.

Dated:  March 27, 2015

Troy L. Nunley
United States District Judge

32